CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney
PAMELA T. JOHANN (CABN 145558)
Chief, Civil Division
JEVECHIUS D. BERNARDONI (CABN 281892)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7224
     Facsimile: (415) 436-6748
     jevechius.bernardoni@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, *et al.*,<br><br>     Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, *et al.*,<br><br>     Defendants. | Case No. 3:25-cv-09277-JD<br><br>**JOINT STATEMENT OF RECENT DECISION**<br><br>The Honorable James Donato |

     Pursuant to Civil Local Rule 7-3(d)(2) of the Local Rules of Practice in Civil Proceedings before the United States District Court for the Northern District of California, the parties jointly submit this Statement of Recent Decision. The citation is *City of Chicago, et al. v. United States Department of Justice, et al.*, No. 25 C 13863 (N.D. Ill. Jan. 15, 2026) at ECF No. 28. Attached as **Exhibit A** is a copy of the relevant opinion.

     //

     //

     //

     //

     //

Dated: January 16, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

By: */s/ Jevechius D. Bernardoni\**

JEVECHIUS D. BERNARDONI
Assistant United States Attorney

Attorneys for Defendants

DAVID CHIU
City Attorney
YVONNE R. MERÉ
Chief Deputy City Attorney
MOLLIE M. LEE
Chief of Strategic Advocacy
SARA J. EISENBERG
Chief of Complex and Affirmative Litigation
KARUN A. TILAK
JESSE E. LANIER
Deputy City Attorneys

By: */s/ Jesse E. Lanier*
JESSE E. LANIER
Deputy City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

TONY LOPRESTI, SBN 289269
County Counsel

By: */s/ Bill Nguyen*
BILL NGUYEN
Deputy County Counsel

KAVITA NARAYAN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
BILL NGUYEN, SBN 333671
Deputy County Counsel
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone:     (408) 299-5900
Facsimile:      (408) 292-7240
E-Mail:          tony.lopresti@cco.sccgov.org

1                Attorneys for Plaintiff
                  COUNTY OF SANTA CLARA

2                ROI I. LUSK
                  City Attorney

By: */s/ Regina L. Nassen*

REGINA L. NASSEN, Ariz. Bar No. 014574*
Principal Assistant City Attorney

Tucson City Attorney's Office
255 W. Alameda, 7th Floor
P.O. Box 27210
Tucson, Arizona 85726-7210
Telephone: (520)837-4207
Facsimile: (520)623-9803
E-Mail: regina.nassen@tucsonaz.gov

ERIN B. BERNSTEIN, SBN 231539
PRIANKA MUNGALE, SBN 348165
Bradley Bernstein Sands, LLP
1212 Broadway, Suite 1100
Oakland, California 94612
Telephone: (510)380-5801
E-Mail: ebernstein@bradleybernstein.com

Attorneys for Plaintiff
CITY OF TUCSON

*Admitted pro hac vice*

HEATHER FERBERT, SBN 246759
City Attorney

By: */s/ Jennifer Martin*

JENNIFER MARTIN
Deputy City Attorney

JEAN JORDAN, SBN 155009
Acting Assistant City Attorney
JULIE RAU, SBN 317658
Lead Deputy City Attorney
JENNIFER MARTIN, SBN 322048
Deputy City Attorney
1200 Third Avenue, Suite 1620
San Diego, CA 92101
Telephone:    (619) 236-6220
Facsimile:    (619) 236-7215
E-Mail:      Jrau@sandiego.org
              MartinJM@sandiego.org

1

Attorneys for Plaintiff
CITY OF SAN DIEGO

2

3

*In compliance with Civil Local Rule 5-1(i)(3), the filer of this document attests under penalty of perjury that all signatories have concurred in the filing of this document.*

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| City of Chicago and City of Saint Paul, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 25 C 13863 |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| United States Department of Justice, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

After Defendants attached conditions to grant money allocated to Plaintiffs, Plaintiffs filed this case alleging that the conditions violate constitutional separation of powers, the Spending Clause, and the Administrative Procedure Act ("APA"). R. 6 ¶ 1. Plaintiffs have until January 16, 2026 to accept the grants, and Plaintiffs contend that Defendants have placed them in an untenable bind: either accept the allegedly unlawful conditions or forego millions of dollars of critical grant money. R. 12 at 7. Plaintiffs move for a preliminary injunction and stay of agency action barring Defendants from enforcing the conditions during the pendency of this case. R. 11. The Court heard oral argument on January 9, 2026. For the reasons stated below, Plaintiffs' motion is granted.

## Background

In 1994, Congress enacted the Public Safety Partnership and Community Policing Act ("COPS Act"). Pub. L. No. 103-322, § 10001. The COPS Act directs the Attorney General to award grants to local governments and other entities for twenty-four enumerated purposes largely related to enhancing cooperation between law enforcement agencies and their local communities. 34 U.S.C. § 10381(a), (b). The Department of Justice ("DOJ") has an Office of Community Oriented Policing Services ("COPS Office") that allocates COPS grants.

Plaintiffs have long relied on COPS grants. The Chicago Police Department has received more than $212 million from COPS grants awarded since 2009, helping to fund 515 entry-level police officer positions. R. 12-2 ¶ 7. These officers have focused on targeting violent crime by developing stronger relationships with community members. *Id.* ¶¶ 8–10. The Saint Paul Police Department has received over $7 million from COPS grants awarded since 2010, helping hire police officers and provide them with mental-health resources. R. 12-3 ¶ 12.

In March 2025, Congress passed an appropriations bill that allocated $417 million to the COPS Office. Pub. L. No. 119-4, § 1301(5). In May 2025, pursuant to that bill, the COPS Office released a Notice of Funding Opportunity for COPS grants. R. 12-2 ¶ 11. In October 2025, the COPS Office approved applications by both Chicago and Saint Paul. R. 12-2 ¶ 17; R. 12-3 ¶ 17. The October 2025 COPS grants to Chicago and Saint Paul, however, include the following "Challenged Conditions" which are the subject of this lawsuit.

- **The Immigration Condition:** Plaintiffs must "comply with 8 U.S.C. § 1373, which provides that such entities may not prohibit, or in any way restrict, any government entity or official from sending to, receiving from, maintaining, or exchanging information regarding citizenship or immigration status, lawful or unlawful, of any individual with components of the U.S. Department of Homeland Security or any other federal, state or local government entity." R. 12-2 at 47; R. 12-3 at 82.

- **The Anti-DEI Condition:** Plaintiffs must certify, subject to prosecution under the False Claims Act, that they do "not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws." R. 12-2 at 47; R. 12-3 at 83.

- **The Executive Order Condition:** Plaintiffs must "comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President." R. 12-2 at 48; R. 12-3 at 83.

- **Federal Funding Restrictions:** Plaintiffs are barred from using COPS funding to (1) to support schools that require COVID-19 vaccinations, (2) to "promote gender ideology," (3) for projects that provide "diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities," and (4) if they "failed to protect public monuments, memorials, and statues." R. 12-2 at 21; R. 12-3 at 31.

2

Plaintiffs allege that these Challenged Conditions violate constitutional separation of powers, the Spending Clause, and the APA, and move for a preliminary injunction and stay of agency action barring Defendants from enforcing these conditions during the pendency of this case. R. 11. Other federal district courts have addressed similar conditional funding schemes during this past year. This Court joins the numerous other district courts which have granted preliminary injunctions in similar cases.[1]

## Discussion

### I. Jurisdiction

Before reaching the merits, the Court must ensure it has subject matter jurisdiction. *Sykes v. Cook Inc.*, 72 F.4th 195, 202 (7th Cir. 2023). Defendants argue that the Court does not have subject matter jurisdiction to hear the instant dispute because Plaintiffs lack standing and because the Tucker Act mandates this case be brought in the Court of Federal Claims. R. 17 at 12–15. For the reasons that follow, the Court finds it has subject matter jurisdiction.

### A. Standing

"Standing is an essential component of Article III's case-or-controversy requirement." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or particular issues." *Perry v. Vill. of Arlington Heights*, 186 F.3d 826, 829 (7th Cir. 1999)

---

[1] *See, e.g.*, *San Francisco Unified Sch. Dist. v. AmeriCorps*, 789 F. Supp. 3d 716 (N.D. Cal. 2025); *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863 (W.D. Wash. 2025); *City and Cnty. of S.F. v. Trump*, 783 F. Supp. 3d 1148 (N.D. Cal. 2025); *Nat'l Ass'n for Advancement of Colored People v. U.S. Dep't of Educ.*, 779 F. Supp. 3d 53 (D.D.C. 2025); *Nat'l Educ. Ass'n v. Trump*, 767 F. Supp. 3d 243 (D. Md. 2025); *Chicago v. Noem*, 2025 WL 3251222 (N.D. Ill. Nov. 21, 2025); *County of Santa Clara v. Noem*, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025); *Housing Auth. of the City and Cnty. of San Francisco v. Turner*, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025); *Chicago v. United States Dep't of Homeland Sec.*, 2025 WL 3043528 (N.D. Ill. Oct. 31, 2025); *Seattle v. Trump*, 2025 WL 3041905 (W.D. Wash. Oct. 31, 2025); *Fresno v. Turner*, 2025 WL 2721390 (N.D. Cal. Sept. 23, 2025).

(citations omitted). As standing is a "jurisdictional requirement, the plaintiff bears the burden of establishing standing." *Apex*, 572 F.3d at 443. To establish standing, a plaintiff must demonstrate "(1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U. S. Bank N.A*, 590 U.S. 538, 540 (2020).

Here, Plaintiffs have not yet suffered a loss of funds based on the Challenged Conditions. As such, Plaintiffs must establish pre-enforcement standing. "Because it would be both foolhardy and unfair to always force a plaintiff to break a law to challenge its legitimacy, the Supreme Court has outlined circumstances in which a party may advance a pre-enforcement challenge before suffering an injury." *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021). In short, pre-enforcement standing exists where the threatened enforcement is "'sufficiently imminent.'" *Id.* (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). Specifically, a plaintiff must allege "'an intention to engage in a course of conduct arguably affected'" by the challenged provision and also that there exists "'a credible threat of prosecution thereunder.'" *Id.* (citing *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). A plaintiff "does not need to show or confess that her intended conduct will actually violate the statute in question if enforcement is likely." *Brown v. Kemp*, 86 F.4th 745, 761 (7th Cir. 2023).

Plaintiffs have established pre-enforcement standing. Regarding the Immigration Condition, Defendants argue that the Plaintiffs have already "certified in their grant applications that they are in compliance with [8 U.S.C.] §1373," and thus there can be no imminent harm related to this condition. R. 17 at 13. But Saint Paul has expressly provided Defendants with notice that it "cannot agree" to the certification. R. 23-1 at 4. And the DOJ has already sued both Chicago and Saint Paul under §1373 and is actively pursuing both cases. *See United States v. State of Illinois*,

No. 25-cv-1285 (N.D. Ill.) (motion to dismiss granted and currently on appeal at No. 25-2904 (7th Cir.)); *United States v. State of Minnesota,* No. 25-cv-3798 (D. Minn.) (case ongoing). The Court reasonably infers that Plaintiffs will continue to engage in the conduct that led to these lawsuits and that DOJ will continue to prosecute such conduct. This is sufficient to establish pre-enforcement standing for the Immigration Condition.

Regarding the other conditions, both Chicago and Saint Paul operate programs that provide DEI support. This runs up against the Anti-DEI Condition, Executive Orders related to DEI, and the Federal Funding Restriction related to DEI. To this end, the DOJ announced in May 2025 that it intends to "utilize the False Claims Act to . . . pursue claims against any recipient of federal funds" that violates laws related to discrimination, which will allow the DOJ to seek treble damages in liability. R. 12-1 at 12. The DOJ further stated that it "strongly encourages these lawsuits." *Id.* To that end, the DOJ has already announced an investigation to determine whether Chicago has engaged in discrimination. *Id.* at 14. The Court reasonably infers that Plaintiffs will continue to provide DEI support. The Court also takes Defendants at their word that they "strongly encourage" lawsuits on these issues. Indeed, if Plaintiffs were to accept the Challenged Conditions, the conditions would provide Defendants with a basis for future litigation.

Plaintiffs have thus established the three elements required for standing. First, Plaintiffs have established an injury in fact that is sufficiently imminent. As set forth above, if Plaintiffs were to accept the grants subject to the Challenged Conditions, there is a credible threat that Defendants would use the conditions as a basis to prosecute the Plaintiffs. Second, the injury is fairly traceable to Defendants because Defendants have imposed the Challenged Conditions. Third, the injury is redressable by the requested injunction because the injunction would prohibit Defendants from enforcing the Challenged Conditions during the pendency of this case.

Consistent with other courts that have addressed standing in similar contexts, the Court finds that Plaintiffs have standing to bring this case.[2] *See, e.g.*, *Chicago v. Noem*, 2025 WL 3251222; *S.F. v. Trump*, 783 F. Supp. 3d 1148.

**B. The Tucker Act**

Defendants argue that the Court lacks jurisdiction because Plaintiffs' claims fall within the Tucker Act and thus that the Court of Federal Claims has exclusive jurisdiction. R. 17 at 13–15. The Tucker Act confers jurisdiction to the Court of Federal Claims for "any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). Congress has also conferred jurisdiction to district courts for substantially the same set of claims listed in the Tucker Act, but where those claims do not "exceed[] $10,000 in amount." 28 U.S.C. § 1346(a)(2). As the Federal Circuit has explained, "the obvious implication of these acts is that Congress intended the Court of Federal Claims to have exclusive jurisdiction to render judgment upon any claim against the United States [as set forth in the Tucker Act] for money damages exceeding $10,000." *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1332 (Fed. Cir. 2004) (citations omitted).

The Supreme Court recently analyzed the Tucker Act in the context of federal grants and held that the district court lacked jurisdiction "to order relief designed to enforce any obligation to pay money pursuant to those grants." *Nat'l Institutes of Health v. Am. Pub. Health Ass'n*, 145 S.

---

[2] In an *amicus curiae* brief, the Federation for American Immigration Reform argues that Plaintiffs' sanctuary policies are unconstitutional and thus that Plaintiffs cannot establish the injury-in-fact requirements of standing. R. 22. The Court agrees with the reasoning in *United States v. Illinois*, 796 F. Supp. 3d 494 (N.D. Ill. 2025), which found that Chicago's sanctuary policies are not unconstitutional. Thus, the *amicus* arguments do not apply.

Ct. 2658 (2025) (per curiam) (citations omitted). In her concurrence, Justice Barrett explained that while the district court "likely lacked jurisdiction to hear challenges to the grant terminations, which belong in the Court of Federal Claims," the district court retained jurisdiction to hear challenges to "vacate the guidance documents." *Id.* at 2661.

Here, Plaintiffs do not seek relief that would obligate Defendants to pay money, nor do they challenge a grant termination. Rather, Plaintiffs seek an order that prohibits Defendants from enforcing the Challenged Conditions set forth in the guidance documents. Jurisdiction in this case is thus consistent with *Nat'l Institutes of Health.* In line with other courts that have addressed the Tucker Act in similar contexts, the Court finds that the Tucker Act does not bar this Court from hearing Plaintiffs' claims. *See, e.g.*, *S.F. v. Turner*, 2025 WL 3187761, at *9 (collecting cases) ("On the record presented here, involving constitutional and APA claims seeking an injunction against the imposition of allegedly unlawful grant conditions, courts have found with near or total uniformity that the district courts have jurisdiction over claims such as these.").

## II.    Preliminary Injunction

To obtain a preliminary injunction, a plaintiff must establish that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The standard is the same for an application for a stay under section 705 of the APA." *Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

### A. Likelihood of Success on the Merits

The Plaintiffs' likelihood of success on the merits "depends on their prospects of successfully meeting the elements of [their] claim[s]." *Minocqua Brewing Co. LLC v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025).

### 1. Constitutional Separation of Powers

The Constitution provides for separation of powers and "disperses the federal power among the three branches—the Legislative, the Executive, and the Judicial—placing both substantive and procedural limitations on each." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991). As relevant, the "authority to pass laws and the power of the purse rest in the legislative not the executive branch." *Chicago v. Barr*, 961 F.3d 882, 892 (7th Cir. 2020). Federal agencies are "charged with administering congressional statutes," so "their power to act and how they are to act is authoritatively prescribed by Congress." *Arlington v. FCC*, 569 U.S. 290, 297 (2013). Agencies may not act "beyond their jurisdiction," in other words, "beyond what Congress has permitted [them] to do." *Id.* at 297–98. To this end, "[a]side from the power of veto, the President is without authority to thwart congressional will by canceling appropriations passed by Congress." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *Id.* at 1235.

Against this backdrop, Plaintiffs argue that by attaching the Challenged Conditions to the COPS grants, Defendants acted beyond what Congress has permitted them to do and have thus violated constitutional separation of powers. R. 12 at 18–20.

To start, Plaintiffs are likely to show that the Challenged Conditions go beyond Defendants' statutory authority. Under 34 U.S.C. § 10382(b), an application for a COPS grant

8

"shall be submitted in such form, and contain such information, as the Attorney General may prescribe by regulation or guidelines." First, the authority to prescribe the application's "form" does not allow the DOJ to impose substantive conditions. Second, Congress listed the required "contents" of the applications under § 10382(c), and the list does not mention immigration, anti-DEI, gender ideology, environmental justice, or any other issues related to the Challenged Conditions. Under § 10388, the Attorney General has authority to "promulgate regulations and guidelines to carry out" the COPS Act. But § 10381(b) enumerates twenty-four purposes for which Defendants may award grants, which are largely related to enhancing cooperation between law enforcement agencies and their local communities. The purposes do not involve immigration, anti-DEI, gender ideology, environmental justice, or any other issues related to the Challenged Condition. And Defendants do not explain how the Challenged Conditions are necessary "to carry out" the COPS Act.

Indeed, when "Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985). Congress knows how to broadly authorize agencies to impose grant conditions. *See e.g.*, 42 U.S.C. § 10305(a)(2) (agency "may establish any condition" that it "considers to be in the best interest of the Nation"). Congress' failure to give broad authorization in the COPS Act further demonstrates that Congress did not authorize the Challenged Conditions.

As the Challenged Conditions likely go beyond Defendants' statutory authority under the COPS Act, Defendants present alternative arguments to try and justify their position. The Court addresses each argument in turn.

9

First, Defendants argue that the separation of powers argument is foreclosed by *Dalton v. Specter*. R. 17 at 18–19. In *Dalton*, the plaintiffs sought to enjoin a decision by the President to close a naval shipyard pursuant to a statute. 511 U.S. 462, 464 (1994). Critically, the decision to close the shipyard had been committed by the statute "to the discretion of the President" and as such, "judicial review of the President's decision [was] not available." *Id.* at 477. The Supreme Court explained that "not . . . every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. In other words, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Id.* at 473. Here, however, and unlike in *Dalton*, Plaintiffs' claims are not rooted solely in a statutory analysis. Rather, Plaintiffs' claims are fundamentally tied to the constitutional allocation of the power of the purse. *Dalton* thus does not foreclose Plaintiffs' claims. *See Chicago v. DHS*, 2025 WL 3043528, at *15 (finding that, where Congress appropriated funds and agency defendants sought to withhold those funds, "*Dalton* is therefore inapposite and does not deprive the plaintiffs of a cause of action for their separation of powers claim").

Second, Defendants argue that the Immigration Condition is justified under *Los Angeles v. Barr*. R. 17 at 25–26. In *L.A. v. Barr*, the DOJ imposed "scoring factors" for reviewing COPS grant applications that gave "additional points to an applicant who agrees" to immigration-related certifications but, critically, the certifications were "not conditions of receiving a grant." 929 F.3d 1163, 1173–74 (9th Cir. 2019). In other words, the scoring factors "encourage[d], but [did] not coerce, an applicant to cooperate on immigration matters." *Id.* at 1176. As such, the Ninth Circuit found that the "DOJ did not exceed its statutory authority in including two scoring factors related to illegal immigration as part of its implementation of the grant program." *Id.* at 1181.

L.A. v. Barr, however, is insufficient to justify the Immigration Condition in this case for the following reasons. First, L.A. v. Barr is distinguishable because the scoring factors were "not conditions of receiving a grant" and thus not coercive. Id. at 1174. Here, the Immigration Condition is a condition of receiving a grant and is thus coercive. Second, the Seventh Circuit has explained that "[i]n the past few years, numerous pieces of legislation were introduced in the House and Senate seeking to condition federal funding on compliance with 8 U.S.C. § 1373—which was intended to address 'sanctuary cities' [and] . . . [n]one of those efforts were passed by Congress." Chicago v. Barr, 961 F.3d at 902–03 (citations omitted). The Seventh Circuit thus found that the Attorney General's interpretation of 34 U.S.C. § 10153 as "requiring compliance with § 1373 . . . would thus allow the Executive Branch to override Congress' refusal to endorse § 1373 compliance and would effectively 'legislate' a different result." Id. Chicago v. Barr is more on point than L.A. v. Barr and is also binding on this Court. L.A. v. Barr thus does not save the Immigration Condition.

Third, Defendants argue that the Anti-DEI Condition is justified because it merely "makes plain that [grant] recipients cannot violate federal anti-discrimination law." R. 17 at 17. But the Court adopts the position set forth in Seattle v. Trump that the Anti-DEI Condition "does not simply require that grant recipients comply with federal antidiscrimination laws." 2025 WL 3041905, at *8. Rather, the Anti-DEI Condition advances the "Administration's own interpretation of 'discrimination' through the threat of the loss of federal funding," and the Administration's anti-DEI interpretation does not further federal anti-discrimination law but is actually "inconsistent with well-established legal precedent." Id. at *7–8 (citations omitted). Put simply, the Anti-DEI Condition appears contrary to established federal anti-discrimination law.

Fourth, Defendants argue that the remaining Challenged Conditions are justified by the President's Executive Orders. R. 17 at 23–24. To this end, Defendants cite a federal regulation which provides that federal agencies must incorporate "[n]ational policy requirements" into the terms of their grants, including policy requirements flowing from "executive order[s]." 2 C.F.R. § 200.211(c)(1)(ii). But "an agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986). In other words, a "regulation cannot create statutory authority; only Congress can do that." *Martin Luther King, Jr. Cnty. v. Turner*, 798 F. Supp. 3d 1224, 1248 (W.D. Wash. 2025). And the COPS Statute "do[es] not allow Executive Orders to control the distribution of funds." *Chicago v. Noem*, 2025 WL 3251222, at *9 n.13. The President's Executive Orders thus do not save the remaining Challenged Conditions.

For these reasons, the Court finds that Plaintiffs are likely to show that, by attaching the Challenged Conditions to the COPS grants, Defendants acted beyond what Congress has permitted them to do and have thus violated constitutional separation of powers.

### 2. The Spending Clause

The "Spending Clause" in Article I, Section 8 of the United States Constitution provides Congress with "broad power . . . to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller*, 596 U.S. 212, 216 (2022). "The Spending Clause applies not only to Congress, but [to] the agencies implementing spending legislation." *AmeriCorps*, 789 F. Supp. 3d at 744. "The spending power is of course not unlimited, but is instead subject to several general restrictions." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citations omitted). First, "the exercise of the spending power must be in pursuit of the general welfare." *Id.* (citations omitted). Second, "if Congress desires to condition the States' receipt of federal funds, it must do so

12

unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* (citations omitted). Third, "conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs." *Id.* (citations omitted). In other words, the grant conditions must be "reasonably related to the purpose of the expenditure." *New York v. United States*, 505 U.S. 144, 172 (1992).

Against this backdrop, Plaintiffs argue that by attaching the Challenged Conditions to the COPS grants, Defendants have violated the Spending Clause. R. 12 at 20–25. Plaintiffs are likely to show that the Immigration Condition, the Anti-DEI Condition, and the Federal Funding Restrictions are not reasonably related to the purpose of the COPS Act. As noted above the purpose of the COPS Act is to enhance cooperation between law enforcement agencies and local communities.

Regarding the Immigration Condition, far from supporting this purpose, the Immigration Condition contravenes it by requiring local police to assist with federal civil immigration enforcement. Rather than enhancing cooperation, the Immigration Condition would likely undermine the relationship between local police and the community. *See Chicago v. Barr*, 961 F.3d at 887 ("The Byrne JAG grant was enacted by Congress to support the needs of local law enforcement to help fight crime, yet it now is being used as a hammer to further a completely different policy of the executive branch—presenting a city such as Chicago with the stark choice of forfeiting the funds or undermining its own law enforcement effectiveness by damaging that cooperative relationship with its residents."); *see also Chicago v. Sessions*, 888 F.3d 272, 291 (7th Cir. 2018) ("On the other hand, the impact on localities forced to comply with these provisions could be devastating. Those local and state governments have concluded that the safety of their communities is furthered by a relationship of trust with the undocumented persons and lawful

immigrants residing therein—and those localities are clearly in the best position to determine the security needs of their own communities. Such trust, once destroyed by the mandated cooperation and communication with the federal immigration authorities, would not easily be restored.").[3]

Regarding the Anti-DEI Condition, the COPS Act requires that grantees "provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." 34 U.S.C. § 10382(c)(11). On its face, the Anti-DEI Condition appears unrelated to the general purpose of the COPS Act to enhance cooperation between law enforcement agencies and local communities and also with the specific mandate to "seek, recruit, and hire members of racial and ethnic minority groups and women." *See id.*

The Immigration Condition and the Anti-DEI Condition are likely not reasonably related to the purpose of the COPS Act for the additional reason that the import of these conditions extends well beyond the police. Under the Immigration Condition, Chicago and Saint Paul "may not prohibit, or in any way restrict *any* government entity or official from sending to, receiving from, maintaining, or exchanging information regarding citizenship or immigration status" with the federal government. R. 12-2 at 47 (emphasis added). And under the Anti-DEI Condition, Chicago and Saint Paul must certify that they do "not operate . . . *any* such programs having components relating to diversity, equity, and inclusion." *Id.* (emphasis added). Chicago and Saint Paul are large cities with many functions that extend beyond their respective police forces. The Immigration Condition and Anti-DEI Condition thus extend well beyond the police and well beyond any reasonable relationship with the purpose of the COPS Act.

---

[3] The Court notes that *Sessions* was vacated in part, including the section of the opinion containing the quoted language, but it was vacated "only as to the narrow issue of whether the preliminary injunction was properly applied beyond the City of Chicago to encompass jurisdictions nationwide." *Chicago v. Sessions*, 2018 WL 4268817, at *1 (7th Cir. June 4, 2018).

Regarding the Federal Funding Restrictions, these restrictions involve COVID-19 vaccinations, gender ideology, anti-DEI policy, environmental justice, and the protection of public monuments. Defendants do not attempt to explain or justify the relationship between these restrictions and the COPS Act's purpose of enhancing cooperation between law enforcement agencies and local communities. *See* R. 17 at 25. And the Court can discern no apparent connection.

Plaintiffs are also likely to show that the Executive Order Condition is impermissibly ambiguous. Under the Spending Clause, "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 24 (1981). "Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions." *Id.* at 25. The Executive Order Condition is impermissibly ambiguous because it is open-ended and retroactive. It does not limit its applicability to existing Presidential Memoranda and Executive Orders. Plaintiffs cannot know and understand their obligations if those obligations are imposed after Plaintiffs sign the grant agreement. The Executive Order Condition is also impermissibly ambiguous because it does not provide a definition of "Presidential Memoranda," thus leaving Plaintiffs to guess as to what is included. Finally, the Executive Order Condition is impermissibly ambiguous because it "incorporate[s] the equally vague language of the [Executive Orders] themselves" and because it does not "specific *which* [Executive Orders] are applicable to grantees" nor does it "explain *how* the [Executive Orders] are applicable to grantees." *Fresno*, 2025 WL 2721390, at *15.

Another court in the Northern District of Illinois analyzed anti-DEI language in an Executive Order that required a grantee to "not operate DEI programs that 'violate any applicable

Federal anti-discrimination laws.'" *Chicago Women in Trades v. Trump*, 778 F. Supp. 3d 959, 984

(N.D. Ill. 2025) (citing Exec. Order No. 14173, 90 Fed. Reg. 8633 § 3(b)(iv)(B)). The court noted:

> [T]he meaning of [the anti-DEI language] is left entirely to the
> grantee's imagination. The Order . . . does not refer to any other
> source indicating what . . . might make any given "DEI" program
> violate Federal anti-discrimination laws. And although the
> government [argued] that the Certification Provision implicates only
> *illegal* DEI programs, it has studiously declined to shed any light on
> what this means. The answer is anything but obvious.

*Id.* Here, likewise, Defendants have failed to shed light on what it might mean for any given

program or component of a program to relate to diversity, equity, and inclusion. As other courts

have found, anti-DEI requirements are "rife with vagueness and ambiguity, leaving grantees to

speculate what is proscribed and what is permitted." *See, e.g.*, *Santa Clara*, 2025 WL 3251660, at

*38 (citations omitted).

For these reasons, the Court finds that Plaintiffs are likely to show that, by attaching the

Challenged Conditions to the COPS grants, Defendants violated the Constitution's Spending

Clause.

### 3. The APA

"The APA's comprehensive provisions for judicial review of 'agency actions,' are

contained in 5 U.S.C. §§ 701–706 . . . [and the] standards to be applied on review are governed by

the provisions of § 706." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). Any person adversely

affected by agency action is entitled to judicial review "as long as the action is a 'final agency

action for which there is no other adequate remedy in court.'" *Id.* (citing 5 U.S.C. § 704). "But

before any review at all may be had, a party must first clear the hurdle of § 701(a)," which allows

for judicial review "'except to the extent that—(1) statutes preclude judicial review; or (2) agency

action is committed to agency discretion by law.'" *Id.* (citing 5 U.S.C. § 701(a)(2)).

Defendants argue that their decision to impose the Challenged Conditions is committed to agency discretion by law and thus that this case is unreviewable under the APA. R. 17 at 28–29. Defendants rely on *Lincoln* for the proposition that the "allocation of funds from a lump-sum appropriation is [an] administrative decision traditionally regarded as committed to agency discretion . . . [because] the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). But this case does not involve the *allocation* of funds. Rather, it involves Defendants' decision to impose the Challenged Conditions in the first place. As the Supreme Court has explained, "we have read the exception in § 701(a)(2) quite narrowly, restricting it to those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (citations omitted). The Court may not have a meaningful standard against which to judge the *amounts* that Defendants choose to allocate to grant applicants. But the Court does have a meaningful standard against which to judge the Challenged Conditions—the twenty-four enumerated purposes set forth in 34 U.S.C. § 10381(b) of the COPS Act. Consistent with other courts that have addressed the APA in similar contexts, the Court finds that the imposition of new funding conditions on grants is not committed to agency discretion by law. *See, e.g., MLK Jr. Cnty.*, 785 F. Supp. 3d at 882–84.

Defendants do not dispute that the Challenged Conditions are a final agency action. "[T]wo conditions must be satisfied for agency action to be 'final': First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been

determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). First, "[w]here an agency establishes conditions on grant eligibility, the agency has taken action that 'mark[s] the consummation of the agency's decisionmaking process.'" *AmeriCorps*, 789 F. Supp. 3d at 740 (citing *Bennett*, 520 U.S. at 177). Second, "legal consequences will flow" from the Challenged Conditions because Defendants can deny or terminate the grants based on Plaintiffs' failure to adhere to the conditions. Consistent with other courts that have addressed the APA in similar contexts, the Court finds that the Challenged Conditions are a final agency action subject to review under the APA. *See, e.g.*, *Chicago v. Noem*, 2025 WL 3251222, at *6 ("The decision to include the challenged conditions in the DHS Standard Terms and Conditions is a final agency action that has not been committed to agency discretion and is thus reviewable.").

Having determined that the APA claim is reviewable, the Court turns to 5 U.S.C. § 706, which provides that "the reviewing court shall . . . hold unlawful and set aside agency action" that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity;" or "(C) in excess of statutory jurisdiction, authority, or limitations." As described above, the Court has already found that Plaintiffs are likely to show that Defendants' actions are contrary to the Constitution and in excess of statutory authority. The Court thus finds that Plaintiffs are likely to show that Defendants have violated the APA.

### B. Irreparable Harm

Plaintiffs are likely to suffer irreparable harm if the Challenged Conditions are not enjoined. "Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). Inadequate does not mean "wholly ineffectual" but,

rather, "the remedy must be seriously deficient as compared to the harm suffered." *Id.* (citations omitted). Irreparable harm "is presumed" when a defendant violates constitutional provisions that protect "intangible and unquantifiable interests." *Ezell v. Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). "The separation of powers is one such interest." *CWIT v. Trump*, 778 F. Supp. 3d at 993; *see also Chicago v. Barr*, 961 F.3d at 892 (By protecting against "the concentration of power" that "would allow tyranny to flourish," the separation of powers is "one of the most vital of the procedural protections of individual liberty found in our Constitution."); *Chicago v. Noem*, 2025 WL 3251222, at *9 (citations omitted) ("The constitutional violation plaintiffs have likely established here, injury to the separation of powers, is the sort of intangible and unquantifiable interest that naturally results in irreparable harm when infringed on."). Plaintiffs have thus sufficiently demonstrated irreparable harm.

The Court further notes that even absent the separation of powers violation, Plaintiffs could still demonstrate irreparable harm. Although "the loss of money is not typically considered irreparable harm," *Nat'l Institutes of Health*, 145 S. Ct. 2658, here, the ripple effects of the Challenged Conditions on Plaintiffs' budget plans and on the ability of the Chicago and Saint Paul to hire and train police to serve their communities are not quantifiable. While losing grant funding is not irreparable harm, the consequence of relying on a diminished police force to serve the community is.

### C. Balance of Equities and Public Interest

As noted above, the third factor regarding the balance of equities and the fourth factor regarding the public interest "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. The public interest is "served by an injunction in that it acts as a check on the executive's encroachment of congressional power that violates the separation of powers." *Chicago v. Barr*,

961 F.3d at 918. Once the moving party establishes a likelihood that the government action was unconstitutional, "the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional." *Am. Civ. Liberties Union of Illinois v. Alvarez*, 679 F.3d 583, 589–90 (7th Cir. 2012).

Granting the requested relief here would also not cause the sort of "disruptive effect[s]" on government operations that could tip the balance of the equities back in the government's favor. *See Trump v. Wilcox*, 145 S.Ct. 1415, 1415 (2025). This is not a case where the executive is being deprived of his choice in officers to effectuate the laws, *see id.*, or where the relief would significantly constrain the choices of how to effectuate the laws available to the executive, *see Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025). The injunction requested here only prevents Defendants from enforcing the Challenged Conditions that are likely unlawful and that depart from the statutes enacted by Congress.

The Court thus finds that all factors weigh in favor of granting a preliminary injunction and issuing a stay under 5 U.S.C. § 705 of the APA.

### Conclusion

For the reasons stated above, Plaintiffs' motion [11] for preliminary injunction and stay of agency action is granted. The Court will separately enter a preliminary injunction order. By 1/21/26, Plaintiffs' counsel shall provide a Word version of a draft preliminary injunction order to the undersigned judge's proposed order inbox after discussing the form of the order with Defendants' counsel. In addition, the parties shall file a joint status report by 1/21/26 setting forth proposed next steps for this case.

**SO ORDERED.**                    **ENTERED: January 15, 2026**

**HON. JORGE L. ALONSO**
**United States District Judge**