UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF JUSTICE, et al.,<br><br>Defendants. | Case No. 25-cv-09277-JD<br><br>**ORDER RE PRELIMINARY INJUNCTION** |

The City and County of San Francisco, the County of Santa Clara, the City of Tucson, and the City of San Diego challenge certain conditions imposed on federal grants awarded by the United States Department of Justice, Office of Community Oriented Policing Services (COPS Office) to fund community policing programs. Defendants are the United States Department of Justice; Attorney General Pam Bondi; the COPS Office; and Cory D. Randolph, a Deputy Director of the COPS Office.[1]

The challenged conditions are requirements that grant recipients agree to comply with all "Presidential Memoranda and all Executive Orders by the President," and certify that they do not "operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws." Grant applicants were also advised that their awards could be placed on hold and "other remedial action" taken if recipients are found to have used the funding (1) to support or subsidize an educational service agency that has a COVID-19 vaccination requirement for in-person program attendance, (2) to "promote gender ideology," (3) to pay for projects that "provide or advance

---

[1] The complaint identified Randoph as the Acting Director of the COPS Office, *see* Dkt. No. 17 ¶ 21, but Randolph's declaration states that he is a Deputy Director. Dkt. No. 33 ¶ 1.

diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities," or (4) if the recipient "failed to protect public monuments, memorials, and statues from destruction or vandalism."

The statute that authorizes the grants, the Public Safety Partnership and Community Policing Act, 34 U.S.C. §§ 10381 et seq., directs the Attorney General to award funds to local governments for 24 enumerated purposes directed toward promoting public safety and community policing, and having more "cops on the beat." *See* 34 U.S.C. §§ 10381(a), (b); *see also City of Los Angeles v. Barr*, 929 F.3d 1163, 1183 (9th Cir. 2019) (Wardlaw, J., dissenting). The statute expressly mandates that grant applicants must "provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." 34 U.S.C. § 10382(c)(11).

The government demands that plaintiffs agree by January 23, 2026, to the challenged conditions if they want to receive the grants. The award letters mandate that grant recipients must "accept all parts of the Award Offer," thereby "bind[ing] the entity to the award terms and conditions," to accept the award. Dkt. No. 20-1 at ECF pp. 29-30. Anything short of that will deprive plaintiffs of the federal grant monies earmarked for them.

Plaintiffs ask the Court to preliminarily enjoin the imposition and enforcement of the challenged conditions. Dkt. No. 20. The record demonstrates that the challenged conditions do not serve the goals and purposes mandated by Congress in the community policing statute, but rather seek to force compliance with the Executive Branch's policy views that are wholly external to the statute. Because plaintiffs have established that they are likely to succeed on the merits of their claims, the Court enjoins the challenged conditions on a preliminary basis.[2]

---

[2] Many other district courts have reached the same result in similar cases. *See, e.g., City of Chicago and City of Saint Paul v. United States Department of Justice*, No. 25 C 13863, 2026 WL 114294 (N.D. Ill. Jan. 15, 2026); *Cal. v. United States Dep't of Transp.*, 788 F. Supp. 3d 316 (D.R.I. 2025); *Martin Luther King, Jr. County v. Turner*, 785 F. Supp. 3d 863 (W.D. Wash. 2025); *Housing Authority of City and County of San Francisco v. Turner*, No. 25-cv-08859-JST, 2025 WL 3187761 (N.D. Cal. Nov. 14, 2025); *County of Santa Clara v. Noem*, No. 25-cv-08330-WHO, 2025 WL 3251660 (N.D. Cal. Nov. 21, 2025).

2

**BACKGROUND**

**I.   THE COMMUNITY POLICING ACT AND THE COMMUNITY ORIENTED POLICING SERVICES (COPS) OFFICE'S GRANTMAKING AUTHORITY**

The parties' familiarity with the facts and the record is assumed. In pertinent summary, in 1994, the United States Congress passed the Public Safety Partnership and Community Policing Act, 34 U.S.C. §§ 10381 et seq. (Community Policing Act, or the Act or statute). The statute authorized the Attorney General to "carry out a single grant program under which the Attorney General makes grants to States, units of local government, Indian tribal governments, other public and private entities, and multi-jurisdictional or regional consortia for the purposes described" in the Act. 34 U.S.C. § 10381(a). These purposes include: (1) "to hire and train new, additional career law enforcement officers for deployment in community-oriented policing"; (2) "to provide specialized training to law enforcement officers to (A) recognize individuals who have a mental illness; and (B) properly interact with individuals who have a mental illness, including strategies for verbal de-escalation of crises"; (3) "to establish collaborative programs that enhance the ability of law enforcement agencies to address the mental health, behavioral, and substance abuse problems of individuals encountered by law enforcement officers in the line of duty"; and (4) "to establish peer mentoring mental health and wellness pilot programs within State, tribal, and local law enforcement agencies." 34 U.S.C. §§ 10381(b)(2), (19), (20), (24).

The Office of Community Oriented Policing Services (COPS Office) was created within the Department of Justice by Attorney General Janet Reno in 1994. Its role is "to handle applications and the awards of grants to cities and states for community-oriented policing" pursuant to the Community Policing Act (COPS grants). *City of Los Angeles*, 929 F.3d at 1183 (Wardlaw, J., dissenting); *see also* Dkt. No. 33 (Randolph Decl.) ¶¶ 1-3.

The statute directs that an application for a COPS grant "shall be submitted in such form, and contain such information, as the Attorney General may prescribe by regulation or guidelines," and no grant may be made unless an application has been approved by the Attorney General. 34 U.S.C. §§ 10382(a), (b). The statute also provides that, "[i]n accordance with the regulations or guidelines established by the Attorney General, each application for a grant under this subchapter

3

shall . . . provide assurances that the applicant will, to the extent practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in order to increase their ranks within the sworn positions in the law enforcement agency." *Id*. § 10382(c)(11).

Four categories of COPS grants are at issue in this case. Grants made under the COPS Hiring Program provide "funding to law enforcement agencies to hire and/or rehire additional career law enforcement officers in an effort to increase their community policing capacity and crime prevention efforts." Dkt. No. 21-1 at 6. Community Policing Development Microgrants are designed to fund "novel or innovative approaches to problem solving by local, state, tribal, and territorial law enforcement agencies that help develop law enforcement's community policing capacity through the implementation of common sense policing strategies." Dkt. No. 21-3 at 8. The Law Enforcement Mental Health and Wellness Act Implementation Projects (Mental Health grants) "provide funding . . . to implement new or enhance existing programs that offer training and services to support officers['] emotional and mental health including through counseling programs, peer mentoring, suicide prevention, stress reduction, and police officer family services." Dkt. No. 21-2 at 6. The Safer Outcomes grants are provided to law enforcement training academies "with the goal of promoting safe outcomes during police encounters with persons in crisis through the integration of de-escalation and crisis response training into their curricula." Dkt. No. 21-4 at 6.

## II.   THE FY25 COPS GRANT PROCESS AND THE CHALLENGED CONDITIONS

In May 2025, the COPS Office issued Notices of Funding Opportunities (NOFOs) to announce the availability of, and application requirements for, the COPS grants at issue. *See* Dkt. No. 21-1 at 1 (advising potential applicants that the COPS Office "is seeking applications for funding for the FY25 COPS Hiring Program"); *see also* Dkt. No. 21-2 at 1 (Mental Health grants); Dkt. No. 21-3 at 1 (Community Policing Development Microgrants); Dkt. No. 21-4 at 1 (Safer Outcomes grants).

Each NOFO included the ensuing "restrictions," which together constitute one of the three conditions plaintiffs are challenging in this case. They were presented under the heading "Federal Funding Restrictions" in the NOFO for the COPS Hiring Program, and that is the term plaintiffs

4

use to refer to this set of conditions in this action for all four categories of COPS grants at issue. *See* Dkt. No. 20 at 5, 7-8.

As the Hiring Program NOFO stated:

**Federal Funding Restrictions**

Please be advised that COPS Office funding must not be used for the following:

1. To directly or indirectly support or subsidize an educational service agency, state educational agency, local educational agency, elementary school, secondary school, or institution of higher education that requires students to have received a COVID-19 vaccination to attend any in-person education program.

2. To promote gender ideology.

3. For projects that provide or advance diversity, equity, inclusion, and accessibility, or environmental justice programs, services, or activities.

4. State and local governments and law enforcement agencies that have failed to protect public monuments, memorials, and statues from destruction or vandalism.

If awarded, and it is determined that the applicant is not in compliance with the funding restrictions, the COPS Office may place a hold on the award and/or take other remedial action.

Dkt. No. 21-1 at 15; *see also* Dkt. No. 21-2 at 15; Dkt. No. 21-3 at 22; Dkt. No. 21-4 at 20.

In June 2025, plaintiffs applied for the COPS grants at issue. *See* Dkt. Nos. 33-8, 33-9, 33-10, 33-11. In October 2025, plaintiffs were advised that their applications had been approved. San Francisco was approved for a $6.25 million COPS Hiring grant award. Dkt. No. 20-4 ¶ 14. Santa Clara was offered a $200,000 Mental Health grant award. Dkt. No. 20-3 ¶ 12. Tucson was approved for a $175,000 Microgrant award to assist with recruiting new officers, Dkt. No. 20-1 ¶ 17, and San Diego for a $750,000 COPS Hiring grant award as well as a $500,000 Safer Outcomes grant award. Dkt. No. 20-2 ¶¶ 4, 9.

Each of these awards included the other two funding conditions that plaintiffs challenge. The Microgrant award to Tucson spells them out under the heading "Award Conditions." The same conditions appear in each of the grants awarded to plaintiffs:

**Condition 3**
Federal Civil Rights and Nondiscrimination Laws (certification): The recipient agrees that its compliance with all applicable Federal civil rights and nondiscrimination laws is material to the government's decision to make this award and any payment thereunder, including for purposes of the False Claims Act (31 U.S.C. 3729-3730 and 3801-3812), and by accepting this award, certifies that it does not operate any programs (including any such programs having components relating to diversity, equity, and inclusion) that violate any applicable Federal civil rights or nondiscrimination laws.

**Condition 4**
Federal Laws, Presidential Memoranda, and Executive Orders: Recipients of grant funding must comply with all applicable federal laws and Presidential Memoranda and all Executive Orders by the President.

Dkt. No. 20-1 at ECF pp. 33-34; *see also* Dkt. No. 20-2 at ECF pp. 11-12, 30; Dkt. No. 20-3 at ECF p. 15; Dkt. No. 20-4 at ECF pp. 11-12.

The parties could not agree on how to refer to these conditions. Plaintiffs called Condition 3 the "Discrimination Condition" and Condition 4 the "EO Condition." Dkt. No. 20. The government favored "Anti-Discrimination Condition" and the "EO Condition." Dkt. No. 32. The Court will refer to them as the "Nondiscrimination/DEI Condition" and the "EO Condition," which together with the Federal Funding Restrictions are the universe of the "Challenged Conditions" litigated here.

The Challenged Conditions embody the policy views stated by the Trump Administration in executive orders and other documents. For example, the Nondiscrimination/DEI Condition reflects an executive order signed by President Trump on his second inauguration day. The order declared that the federal government's support for "illegal and immoral discrimination programs, going by the name 'diversity, equity, and inclusion' (DEI) . . . ends today." Exec. Order No. 14151, *Ending Radical and Wasteful Government DEI Programs and Preferencing*, 90 Fed. Reg. 8339 (Jan. 20, 2025). The order directed "[e]ach agency" to provide to the Director of the Office of Management and Budget, a list of all "Federal grantees who received Federal funding to provide or advance DEI" so that they could be terminated. *Id*. §§ 2(a), (b)(ii)(C). Deputy agency or department heads were also to "recommend actions . . . to align . . . grants" with the policy outlined in the executive order. *Id*. §2(b)(iii)(B).

6

Another executive order issued the next day stated that "critical and influential institutions of American society, including the Federal Government . . . have adopted and actively use dangerous, demeaning, and immoral race- and sex-based preferences under the guise of so-called 'diversity, equity, and inclusion' (DEI) or 'diversity, equity, inclusions, and accessibility' (DEIA) that can violate the civil-rights laws of this Nation." Exec. Order No. 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025). The order further directed that "[t]he head of each agency shall include in every contract or grant award: (A) A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and (B) A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." *Id*. § 3(b)(iv).

On July 29, 2025, Attorney General Pam Bondi issued a memorandum to all federal agencies titled, "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination." *See* Dkt. No. 21-5 (AG Memorandum). The memorandum identifies "best practices" to help federal grant recipients "comply with federal antidiscrimination laws and avoid legal pitfalls." *Id.* at 1. It states that "[u]sing race, sex, or other protected characteristics for employment, program participation, resource allocation, or other similar activities, opportunities, or benefits, is unlawful, except in rare cases where such discrimination satisfies the relevant level of judicial scrutiny." *Id*. at 2. The memorandum says that "[f]acially neutral criteria (e.g., 'cultural competence,' 'lived experience,' geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." *Id*.

### III. THIS LITIGATION

San Francisco, Santa Clara, and Tucson filed a complaint on October 28, 2025. Dkt. No. 1. San Diego was added in a first amended complaint (FAC) filed on November 4, 2025, which is the operative complaint. *See* Dkt. No. 17. Plaintiffs moved for a preliminary injunction,

7

Dkt. No. 22, and the motion is fully briefed. Dkt. Nos. 32, 35. A preliminary injunction hearing was held on December 18, 2025. *See* Dkt. No. 40.

At the Court's request, the government extended plaintiffs' original acceptance deadline of November 24, 2025, to accommodate the Court's consideration of the injunction motion. The deadline to accept the COPS grant awards is January 23, 2026. Dkt. No. 33 (Randolph Decl.) ¶ 26.

## DISCUSSION

### I. LEGAL STANDARDS

Preliminary injunctions are "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

In our circuit, it is well established that a preliminary injunction may also be issued where "the likelihood of success is such that 'serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citation omitted). Where the plaintiff has raised "at least 'serious questions' going to the merits" and clear irreparable injury would result in the absence of an injunction, the Court has the discretion to "preserve the *status quo* with provisional relief until the merits c[an] be sorted out." *Id.* at 1134.[3]

### II. THE TUCKER ACT AND THE COURT'S JURISDICTION

The government's starting position in its opposition brief was that this case belonged in a different court. The government said that the Court "lacks jurisdiction over key aspects of what is, at base, a contractual dispute." Dkt. No. 32 at 1. This theory was based on the Tucker Act, 28

---

[3] Our circuit held after careful consideration that "the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test," *Alliance for the Wild Rockies*, 632 F.3d at 1131-32, and has continued to apply the test. *See, e.g., hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022); *Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1177 (9th Cir. 2021).

8

U.S.C. § 1491(a)(1), which vests exclusive jurisdiction over contract claims against the United States in the Court of Federal Claims, and "'impliedly forbids' bringing 'contract actions' against 'the government in a federal district court.'" *Id*. at 6 (citation omitted).

But the government adopted a more nuanced position in subsequent statements to the Court. During the preliminary injunction hearing, counsel for the government forthrightly said that the government was not "suggesting that this Court . . . has zero jurisdiction under the Tucker Act to . . . enter an appropriately tailored injunction as to the challenged conditions." Dkt. No. 41 (Hearing Transcript) at 7:3-6. Counsel underscored that "the Government's not saying that the Court cannot issue an injunction enjoining the challenged conditions." *Id*. at 7:7-8.

These statements correctly acknowledge that the Tucker Act is not a bar to the Court's jurisdiction over this lawsuit. Plaintiffs' case is rooted in statutory and constitutional commands, not in contract law. *See* Dkt. No. 17 ¶¶ 107-64. This is not a lawsuit that seeks to enforce contractual obligations. *See id.* at 35-37; Dkt. No. 20 at 24. It may be that the practical effect of the claims "would require the payment of money by the federal government" in the form of a release of funds without the challenged conditions, but that is not the same as suing for an award of money damages pursuant to a contract. *Bowen v. Mass.*, 487 U.S. 879, 893-94 (1988) (the "fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages'"); *see also Dep't of Education v. Cal.*, 604 U.S. 650, 651 (2025) (recognizing that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds") (quoting *Bowen*, 487 U.S. at 910). Plaintiffs' claims are not "disguised breach-of-contract claim[s]" that are subject to the exclusive jurisdiction of the Court of Federal Claims under the Tucker Act. *Thakur v. Trump*, -- F.4th --, No. 25-4249, 2025 WL 3760650, at *3 (9th Cir. Dec. 23, 2025) (quotations omitted).

### III. THE INJUNCTION FACTORS

#### A. Success on the Merits

Plaintiffs have a rather elaborate architecture of claims. They say the Challenged Conditions (1) are unconstitutional because they violate (a) separation of powers and

9

(b) restrictions on the spending power pursuant to the Spending Clause, U.S. Const. art. I, § 8, cl. 1, and (2) violate the Administrative Procedure Act (APA), 5 U.S.C. § 706, because they are (a) "contrary to the Constitution and in excess of statutory jurisdiction" and (b) "arbitrary and capricious." Dkt. No. 20 at 9-21.[4] The arguments for these propositions overlap to a substantial degree. The Court need not take up each theory because plaintiffs have established a likelihood of success on the APA claim that the COPS Office did not have the constitutional or statutory authority to impose the conditions. That is enough to warrant an injunction.

### 1. The APA Claim

The government's starting position with respect to the APA is that there are no standards for the Court to apply because "the grant awards at issue are discretionary." Dkt. No. 32 at 16-17. It is true that "[a]n agency's allocation of appropriated funds is typically and presumptively committed to agency discretion by law," *id*. at 17, but that is entirely beside the point here. The grants have already been allocated to plaintiffs. Plaintiffs are challenging the conditions that the COPS Office attached to the disbursement of the allocated funds, and not the discretion to allocate the funds in the first instance.

The governing standard for this claim is crystal clear. It is the plain text of the Community Policing Act, which is the sole statutory basis of the grantmaking authority held by the COPS Office, and sets the boundaries for the actions taken by it. The Act does not give the COPS Office unfettered discretion to attach conditions of its choice to the community policing grants it makes, and this case is not one of those "rare instances where statutes are drawn in such broad terms that . . . there is no law to apply, thereby leaving the court with no meaningful standard against which to judge the agency's exercise of discretion." *ASSE Int'l, Inc. v. Kerry*, 803 F.3d 1059, 1068 (9th Cir. 2015) (quotations omitted).[5]

---

[4] The FAC also includes a Fifth Amendment due process claim for unconstitutional vagueness, Dkt. No. 17 ¶¶ 132-43, but plaintiffs do not rely on this claim for their preliminary injunction request. *See* Dkt. No. 20.

[5] Judicial review under the APA requires the existence of a "final agency action." 5 U.S.C. § 704. The government agreed at the preliminary injunction hearing that it is not contesting that the COPS Office's imposition of the Challenged Conditions constituted a final agency action that is reviewable under the APA. *See* Dkt. No. 41 at 10:12-20.

10

1	Under the APA, the Court must set aside an agency action that is "contrary to
2	constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority,
3	or limitations," or "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance
4	with law." 5 U.S.C. §706(2). Plaintiffs' main contention on these grounds is that "the Executive
5	Branch 'has no power to act . . . unless and until Congress confers power upon it.'" Dkt. No. 20 at
6	10 (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). In plaintiffs' view,
7	the plain language of the Community Policing Act leaves no room for the imposition of the
8	Challenged Conditions, and no other statute fills in that void. *Id*. at 10-11, 18-19. Consequently,
9	the conditions cannot survive review under the APA.

10	The point is well taken. The Community Policing Act authorizes the award of federal
11	funds to local governments to promote public safety and community policing. Its language is
12	clear and direct, and leaves no room for the conditions the government seeks to impose here.
13	Where then does the government find statutory authority to impose conditions on local
14	governments about COVID-19 vaccinations, "gender ideology," or the vandalism of public
15	monuments? It did not rely on anything in the statute, and the plain language of the Community
16	Policing Act does not reveal a basis for the government's actions.

17	As plaintiffs suggest, a good argument can be made that the conditions actually conflict
18	with the statute. For example, the Nondiscrimination/DEI Condition and the DEI-related Federal
19	Funding Restriction forbid efforts to "advance diversity, equity, inclusion, and accessibility," Dkt.
20	No. 21-1 at 15, and the President's executive orders and the DOJ Memorandum described above
21	amplify the message that grant recipients may not use the funds for programs that take into
22	consideration an individual's characteristics such as race or sex. But the Community Policing Act
23	expressly requires that grant applicants "provide assurances that the applicant will, to the extent
24	practicable, seek, recruit, and hire members of racial and ethnic minority groups and women in
25	order to increase their ranks within the sworn positions in the law enforcement agency." 34
26	U.S.C. § 10382(c)(11). There is no way to reconcile the conditions with the statute short of
27	engaging in doublethink that forbidding considerations of race and gender is the same as taking
28

11

them into account.  The stark conflict between the plain language of the statute and the Challenged Conditions is a sure sign that the COPS Office acted outside its statutory authority.

The government's main response to all of this is to say that the Challenged Conditions simply require plaintiffs to follow the law.  It points, for example, to Title VI of the Civil Rights Act of 1964, which requires recipients of federal assistance to "comply with federal anti-discrimination law."  Dkt. No. 32 at 8 (citing 42 U.S.C. § 2000d).  In the government's view, the Nondiscrimination/DEI Condition merely "makes plain that recipients cannot violate federal anti-discrimination law."  *Id*. at 9.  For the EO Condition and the Federal Funding Restrictions as well, the government says that "[t]he COPS Office is required to ensure that all grants comply with federal law and the EO Condition and the Federal Funding Restrictions are another way to ensure that requirement is met."  *Id*. at 16.  In effect, the government declares executive orders to be the law.  It says that all of the Challenged Conditions "merely reiterate that recipients must comply with federal anti-discrimination law and executive orders," *id*. at 17, and that the "COPS Office is required to enforce all federal anti-discrimination laws and has the authority to require recipients to follow executive orders."  *Id*. at 18.

This theory is subject to serious doubt.  To start, plaintiffs are required to follow federal law irrespective of an express condition in a grant.  They are no more free to flout the Community Policing Act or any other federal law than the government is.  The suggestion that executive orders are on parity with statutes is bereft of any meaningful support in the government's briefs, all the more so when, as demonstrated, the executive orders' directives stand in direct conflict with the plain text of the Community Policing Act.  So too for the government's assertion that the COPS Office may seek to compel compliance with executive orders under threat of losing funding or even facing liability under the False Claims Act, 31 U.S.C. § 3729.  The government did not identify any legal basis for those propositions.  The government mentions a federal regulation indicating that "the COPS Office is required to incorporate into the terms of its grants 'national policy requirements,' including those flowing from 'executive order[s],'" Dkt. No. 32 at 15 (quoting 2 C.F.R. § 200.211(c)(1)(ii)), but a regulation is not a statute.  While Congress may delegate to an agency the "authority to give meaning to a particular statutory term" or "to

12

1  prescribe rules to fill up the details of a statutory scheme," in all cases it is the role of the courts to
2  "effectuate the will of Congress subject to constitutional limits," without giving deference to
3  agency interpretations of statutes or the Constitution. *Loper Bright Enterprises v. Raimondo*, 603
4  U.S. 369, 391-95 (2024) (cleaned up). Here, the government has failed to identify any
5  constitutional or statutory provision that authorized the COPS Office to impose the Challenged
6  Conditions.

7  Overall, plaintiffs have demonstrated a likelihood of success on the merits of their fourth,
8  fifth, and sixth causes of action under the APA. Dkt. No. 17 ¶¶ 144-64. While this likelihood of
9  success could be analyzed in constitutional terms as well, the Court declines at this time to take up
10  plaintiffs' first and second causes of action, which squarely assert claims under the United States
11  Constitution for "violation of separation of powers" and "violation of spending power." *Id*.
12  ¶¶ 107-31. The "fundamental and longstanding principle of judicial restraint" counsels courts to
13  "avoid reaching constitutional questions in advance of the necessity of deciding them." *Al Otro*
14  *Lado v. Exec. Office for Immigration Review*, 138 F.4th 1102, 1123 (9th Cir. 2025) (quotations
15  omitted). Plaintiffs' likelihood of success for their APA claims establishes the most important
16  element required for an injunction.

17  **B.    Irreparable Harm**

18  Plaintiffs have demonstrated that they face a threat of irreparable harm. Because the
19  conditions imposed on the grants are unlawful, being forced to accept them would impose
20  irreparable harm on plaintiffs. *See Hernandez v. Sessions*, 872 F.3d 976, 994 (9th Cir. 2017).

21  So too if plaintiffs lose the funds. San Francisco intends to use its $6.25 million COPS
22  Hiring grant to redress personnel shortages in its police department, which in 2025 was
23  understaffed by about 30%. Dkt. No. 20-4 ¶¶ 5, 13, 14. San Francisco had a projected budget
24  deficit of almost $800 million for fiscal years 2025 through 2027, and it does not have any
25  realistic alternative funding to hire officers if it cannot access its COPS grant funds. *Id*. ¶¶ 13, 15-
26  17. San Diego received a $500,000 Safer Outcomes grant to fund its police department's efforts
27  to train and support officers' crisis response, and it too lacks alternative funding. Dkt. No. 20-2
28  ¶ 7, 9, 15. Tucson received a $175,000 Microgrant award to assist with recruiting new officers,

13

Dkt. No. 20-1 ¶ 17, and it plans to use the funds to "recruit[] a candidate pool from diverse backgrounds." *Id.*, Ex. A at 3. Tucson says finding alternative funding would "present[] profound challenges." Dkt. No. 20-1 ¶ 18. Santa Clara received a $200,000 Mental Health grant award and plans to use the funds to address the acute need for mental health services for staff at the Santa Clara County Sheriff's Office. Dkt. No. 20-3 ¶¶ 12, 18-20. Santa Clara is projecting a loss of $1 billion in funding this fiscal year, and without the COPS Mental Health grant, Santa Clara will likely have to take away funding from other public safety services or forgo the planned mental health services. *Id.* ¶ 21. These are harms that cannot be remedied by an award of damages further down the road. *See Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

### C.   Balance of Hardships and the Public Interest

The balance of hardships and the public interest are considered together in this case. *See E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 984 (9th Cir. 2020) ("When the government is a party, the third and fourth preliminary injunction factors merge.") (citing *Drakes Bay Oyster Co. v. Jewell*, 743 F.3d 1073, 1092 (9th Cir. 2014)). A preliminary injunction will not be granted unless the public interests in favor of granting an injunction "outweigh other public interests that cut in favor of *not* issuing the injunction." *Alliance for the Wild Rockies*, 632 F.3d at 1138 (emphasis in original).

The balance of hardships tips sharply in plaintiffs' favor and the public interest supports an injunction. As discussed, plaintiffs have shown that they will suffer irreparable harm in the absence of an injunction. The government, on the other hand, has not shown that it will suffer any harm, monetary or otherwise, if an injunction were to issue. This is all the more so in light of the government's frequent assertion that the Challenged Conditions seek only the enforcement of federal law as it currently stands. *See* Dkt. No. 32 at 10 (plaintiffs are simply being asked to "agree[] not to violate the laws currently in place"). Pausing the imposition and enforcement of the Challenged Conditions will have no effect on plaintiffs' obligations to comply with all federal laws. Enjoining conditions that are likely to be unlawful is eminently in the public interest.

**D.      Bond**

Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The district court retains discretion "as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal quotation marks and citations omitted).

The government asked for plaintiffs to post security, and to set the bond amount to "reflect the cost and disruption to the COPS Office's administration to [*sic*] the grants at issue in this proceeding resulting from Plaintiffs' requested relief." Dkt. No. 32 at 22. But the government did not say what this amount might be, and did not provide any criteria or other guidance for the Court to consider in calculating a bond.

The Court declines to fill in the blanks for the government. There is also no evidence in the record of a "realistic likelihood of harm to the defendant from enjoining his or her conduct." *Johnson*, 572 F.3d at 1086 (quotations and citation omitted). A bond will not be required.

## CONCLUSION

A preliminary injunction to preserve the status quo pending trial is granted.

Defendants and their officers, agents, employees, attorneys, and any person acting in concert with them, or at their behest, and who has knowledge of this injunction, are preliminarily enjoined from (a) imposing or enforcing the Challenged Conditions for the COPS grants to plaintiffs; and (b) withholding or terminating FY25 COPS grant funding on the ground that plaintiffs did not accept or comply with the Challenged Conditions.

The injunction will remain in place pending further order of the Court. Either side may request a modification of the injunction as circumstances warrant.

//

//

//

1  The parties are directed to file a joint status report by February 4, 2026, that includes a
2  proposed case schedule providing for a trial in August 2026. The case management conference
3  that was set for January 29, 2026, is vacated.

4  **IT IS SO ORDERED.**

5  Dated: January 21, 2026

_____
JAMES DONATO
United States District Judge