DAVID CHIU, SBN 189542
City Attorney
YVONNE R. MERÉ, SBN 175394
Chief Deputy City Attorney
MOLLIE M. LEE, SBN 251404
Chief of Strategic Advocacy
SARA J. EISENBERG, SBN 269303
Chief of Complex and Affirmative Litigation
KARUN A. TILAK, SBN 323939
JESSE E. LANIER, SBN  303395
Deputy City Attorneys
Fox Plaza
1390 Market Street, 6th Floor
San Francisco, CA 94102-5408
Telephone: (415) 554-4223
Facsimile: (415) 437-4644
E-Mail:  Jesse.Lanier@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

*[additional counsel on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO; COUNTY OF SANTA CLARA; and CITY OF TUCSON,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>UNITED STATES DEPARTMENT OF JUSTICE; PAMELA J. BONDI, in her Official Capacity; OFFICE OF COMMUNITY ORIENTED POLICING SERVICES; and CORY D. RANDOLPH, in his official capacity,<br><br>　　　　Defendants. | Case No. 3:25-cv-09277-JD<br><br>**PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:　August 20, 2026<br>Time:　　　　10 a.m.<br>Judge:　　　 Hon. James Donato<br>Place:　　　 Courtroom 11, 19th Floor<br><br>Date Filed:　 October 28, 2025<br>Trial Date:　 None Set |

TONY LOPRESTI, SBN 289269
County Counsel
KAVITA NARAYN, SBN 264191
Chief Assistant County Counsel
MEREDITH A. JOHNSON, SBN 291018
Lead Deputy County Counsel
BILL NGUYEN, SBN 333671
Deputy County Counsel
70 W. Hedding Street, East Wing, 9th Floor
San José, CA 95110
Telephone: (408) 299-5900
Facsimile: (408) 292-7240
E-Mail: bill.nguyen@cco.sccgov.org
Attorneys for Plaintiff
COUNTY OF SANTA CLARA

HEATHER FERBERT, SBN 246759
City Attorney
JEAN JORDAN, SBN 155009
Acting Assistant City Attorney
JULIE RAU, SBN 317658
Lead Deputy City Attorney
JENNIFER MARTIN, SBN 322048
Deputy City Attorney
1200 Third Avenue, Suite 1620
San Diego, CA 92101
Telephone: (619) 236-6220
Facsimile: (619) 236-7215
E-Mail: Jrau@sandiego.org
        MartinJM@sandiego.org
Attorneys for Plaintiff
CITY OF SAN DIEGO

ROI I. LUSK
City Attorney
REGINA L. NASSEN, Ariz. Bar No. 014574*
Principal Assistant City Attorney
Tucson City Attorney's Office
255 W. Alameda, 7th Floor
P.O. Box 27210
Tucson, Arizona 85726-7210
Telephone: (520)837-4207
Facsimile: (520)623-9803
E-Mail: regina.nassen@tucsonaz.gov

ERIN B. BERNSTEIN, SBN 231539
PRIANKA MUNGALE, SBN 348165
Bradley Bernstein Sands, LLP
1212 Broadway, Suite 1100
Oakland, California 94612
Telephone: (510)380-5801
E-Mail: ebernstein@bradleybernstein.com
Attorneys for Plaintiff
CITY OF TUCSON
*Admitted pro hac vice

### REQUEST FOR JUDICIAL NOTICE

Pursuant to Federal Rule of Evidence 201, Plaintiffs respectfully request that the Court take judicial notice of **Exhibits A and B** in support of their Motion for Summary Judgment, true and correct copies of which are attached hereto:

- **Exhibit A**: Memorandum issued by then–Attorney General Pam Bondi to all federal agencies on July 29, 2025, titled *Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination*. A publicly available copy of the memorandum is available on the DOJ's website: https://www.justice.gov/ag/media/1409486/dl [https://perma.cc/HSY4-AP2B].

- **Exhibit B**: Memorandum issued by then–Deputy (now Acting) Attorney General Todd Blanche on May 19, 2025, titled *Civil Rights Fraud Initiative*. A publicly available copy of the memorandum is available on the DOJ's website: https://www.justice.gov/dag/media/1400826/dl?inline.

A court must take judicial notice of facts not in dispute if requested by a party and supplied with the necessary information. Fed. R. Evid. 201(c)(2). A court may take judicial notice of any fact "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). It is well established that judicial notice may be taken of "matters of public records," *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001), including government documents, *see DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 n.5 (9th Cir. 2018) (taking judicial notice of "government documents . . . and undisputed matters of public record").

Both Exhibits A and B are agency-wide and public-facing memoranda issued by then-Attorney General Pam Bondi and then–Deputy (now Acting) Attorney General Todd Blanche that are properly subject to judicial notice. This court has previously held that "government memoranda, bulletins, reports, letters, and statements of public record are appropriate for judicial notice." *Cnty. of Santa*

*Clara v. Trump*, 267 F. Supp. 3d 1201, 1217 (N.D. Cal. 2017) (taking judicial notice of memorandum prepared by U.S. Department of Justice official).

For these reasons, Plaintiffs respectfully request that the Court take judicial notice of **Exhibits A and B**.

Dated: April 17, 2026                              Respectfully submitted,

                                                   DAVID CHIU
                                                   City Attorney
                                                   YVONNE R. MERÉ
                                                   Chief Deputy City Attorney
                                                   MOLLIE M. LEE
                                                   Chief of Strategic Advocacy
                                                   SARA J. EISENBERG
                                                   Chief of Complex and Affirmative Litigation
                                                   KARUN A. TILAK
                                                   JESSE E. LANIER
                                                   Deputy City Attorneys

                                            By: /s/ *Jesse E. Lanier*
                                                   JESSE E. LANIER
                                                   Deputy City Attorney

                                                   Attorneys for Plaintiff
                                                   CITY AND COUNTY OF SAN FRANCISCO

                                                   TONY LOPRESTI, SBN 289269
                                                   County Counsel

                                            By: */s/ Bill Nguyen*
                                                   BILL NGUYEN
                                                   Deputy County Counsel

                                                   KAVITA NARAYAN, SBN 264191
                                                   Chief Assistant County Counsel
                                                   MEREDITH A. JOHNSON, SBN 291018
                                                   Lead Deputy County Counsel
                                                   BILL NGUYEN, SBN 333671
                                                   Deputy County Counsel
                                                   70 W. Hedding Street, East Wing, 9th Floor
                                                   San José, CA 95110
                                                   Telephone:    (408) 299-5900

RJN ISO MSJ                                        4
Case No. 3:25-cv-09277-JD

Facsimile:    (408) 292-7240
E-Mail:    bill.nguyen@cco.sccgov.org

Attorneys for Plaintiff
COUNTY OF SANTA CLARA

ROI I. LUSK
City Attorney

By: /s/ Regina L. Nassen
REGINA L. NASSEN, Ariz. Bar No. 014574*
Principal Assistant City Attorney

Tucson City Attorney's Office
255 W. Alameda, 7th Floor
P.O. Box 27210
Tucson, Arizona 85726-7210
Telephone: (520)837-4207
Facsimile: (520)623-9803
E-Mail: regina.nassen@tucsonaz.gov

ERIN B. BERNSTEIN, SBN 231539
PRIANKA MUNGALE, SBN 348165
Bradley Bernstein Sands, LLP
1212 Broadway, Suite 1100
Oakland, California 94612
Telephone: (510)380-5801
E-Mail: ebernstein@bradleybernstein.com

Attorneys for Plaintiff
CITY OF TUCSON

HEATHER FERBERT, SBN 246759
City Attorney

By: /s/ Jennifer Martin
JENNIFER MARTIN
Deputy City Attorney

JEAN JORDAN, SBN 155009
Acting Assistant City Attorney
JULIE RAU, SBN 317658
Lead Deputy City Attorney
JENNIFER MARTIN, SBN 322048
Deputy City Attorney
1200 Third Avenue, Suite 1620
San Diego, CA 92101
Telephone: (619) 236-6220

Facsimile: (619) 236-7215
E-Mail: Jrau@sandiego.org
        MartinJM@sandiego.org

Attorneys for Plaintiff
CITY OF SAN DIEGO

**FILER'S ATTESTATION**

I, JESSE LANIER, am the ECF user whose identification and password are being used to file this PLAINTIFFS' REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT. Pursuant to Civil Local Rule 5-1(i)(3), I hereby attest that the other above-named signatories concur in this filing.

# Exhibit A



# Office of the Attorney General
## Washington, D. C. 20530

July 29, 2025

MEMORANDUM FOR ALL FEDERAL AGENCIES

FROM:             THE ATTORNEY GENERAL

SUBJECT:          GUIDANCE FOR RECIPIENTS OF FEDERAL FUNDING
                  REGARDING UNLAWFUL DISCRIMINATION

## I.    INTRODUCTION

One of our Nation's bedrock principles is that all Americans must be treated equally. Not only is discrimination based on protected characteristics illegal under federal law, but it is also dangerous, demeaning, and immoral. Yet in recent years, the federal government has turned a blind eye toward, or even encouraged, various discriminatory practices, seemingly because of their purportedly benign labels, objectives, or intentions. No longer. Going forward, the federal government will not stand by while recipients of federal funds engage in discrimination.

This guidance clarifies the application of federal antidiscrimination laws to programs or initiatives that may involve discriminatory practices, including those labeled as Diversity, Equity, and Inclusion ("DEI") programs.[1] Entities receiving federal funds, like all other entities subject to federal antidiscrimination laws, must ensure that their programs and activities comply with federal law and do not discriminate on the basis of race, color, national origin, sex, religion, or other protected characteristics—no matter the program's labels, objectives, or intentions. In furtherance of that requirement, this guidance identifies "Best Practices" as non-binding suggestions to help entities comply with federal antidiscrimination laws and avoid legal pitfalls; these are not mandatory requirements but rather practical recommendations to minimize the risk of violations.

Entities that receive federal financial assistance or that are otherwise subject to federal anti-discrimination laws, including educational institutions, state and local governments, and public and private employers, should review this guidance carefully to ensure all programs comply with their legal obligations.

---

[1] DEI programs go by other names as well, such as Diversity, Equity, Inclusion, and Accessibility ("DEIA") and Diversity, Equity, Inclusion, and Belonging ("DEIB").

## II.    EXECUTIVE SUMMARY

This guidance emphasizes the significant legal risks of initiatives that involve discrimination based on protected characteristics and provides non-binding best practices to help entities avoid the risk of violations. Key points include:

- **Statutory nondiscrimination requirements:** Federal law prohibits discrimination based on protected characteristics like race, sex, color, national origin, or religion.

- **Legal pitfalls of DEI Programs:** The use of terms such as "DEI," "Equity," or other euphemistic terms does not excuse unlawful discrimination or absolve parties from scrutiny regarding potential violations.

- **Prohibition on Protected Characteristics as Criteria:** Using race, sex, or other protected characteristics for employment, program participation, resource allocation, or other similar activities, opportunities, or benefits, is unlawful, except in rare cases where such discrimination satisfies the relevant level of judicial scrutiny.

- **Importance of Sex-Separated Intimate Spaces and Athletic Competitions:** Compelling employees to share intimate spaces with the opposite sex or allowing men to compete in women's athletic competitions would typically be unlawful.

- **Unlawful Proxy Discrimination:** Facially neutral criteria (e.g., "cultural competence," "lived experience," geographic targeting) that function as proxies for protected characteristics violate federal law if designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics.

- **Scrutiny of Third-Party Funding:** Recipients of federal funds should ensure federal funds do not support third-party programs that discriminate.

- **Protection Against Retaliation:** Individuals who object to or refuse to participate in discriminatory programs, trainings, or policies are protected from adverse actions like termination or exclusion based on that individual's opposition to those practices.[2]

## III.    KEY FEDERAL ANTIDISCRIMINATION PROVISIONS AND LAW

Federal antidiscrimination laws prohibit discrimination on the basis of protected characteristics, including race, color, religion, sex, and national origin. The U.S. Supreme Court has consistently held that policies or practices based upon protected characteristics are subject to

---

[2] Unlawful retaliation occurs when a federally funded entity takes adverse actions against employees, participants, or beneficiaries because they engage in protected activities related to opposing DEI practices they reasonably believe violate federal antidiscrimination laws.

rigorous judicial scrutiny. Race-based classifications are subject to strict scrutiny, requiring a compelling governmental interest and narrowly tailored means to achieve that interest.[3] Sex-based classifications are subject to heightened scrutiny, requiring an exceedingly persuasive justification and substantial relation to an important governmental objective.[4] Discrimination based on other protected characteristics, such as religion, is also evaluated under analogous standards.[5] Entities receiving federal funds must comply with applicable civil rights laws, including:

- **Title VI of the Civil Rights Act of 1964:** Prohibits discrimination based on race, color, or national origin in any program or activity receiving federal financial assistance. This includes most educational institutions, healthcare providers, and state and local government agencies.

- **Title VII of the Civil Rights Act of 1964:** Prohibits employment discrimination based on, or motivated by, race, color, religion, sex, or national origin, in any terms, conditions, or privileges of employment, including hiring, promotion, demotion, termination, compensation, job transfers, training, or access to employment privileges and benefits.

- **Title IX of the Education Amendments of 1972:** Prohibits discrimination based on sex in education programs or activities receiving federal financial assistance. Title IX protections extend beyond athletics and include addressing sexual harassment, sex-based harassment, admissions policies, and equal access to resources and programs.

---

[3] *See, e.g., Students for Fair Admissions, Inc. v. Harvard,* 600 U.S. 181, 214 (2023) (holding racial classifications by public institutions are subject to strict scrutiny and racial classifications by private institutions can serve as basis for revoking funding under Title VI); *Ricci v. DeStefano,* 557 U.S. 557, 579 (2009) ("[E]xpress, race-based decision-making violates Title VII's command that employers cannot take adverse employment actions because of an individual's race."); *see also Vitolo v. Guzman,* 999 F.3d 353, 361 (6th Cir. 2021) (holding grant program with race and sex preferences is unlawful under Equal Protection Clause).

[4] *See, e.g., United States v. Virginia,* 518 U.S. 515, 531 (1996).

[5] *See, e.g., Espinoza v. Montana Dep't of Revenue,* 591 U.S. 464, 479 (2020) ("The Free Exercise Clause, which applies to the States under the Fourteenth Amendment, protects religious observers against unequal treatment and against laws that impose special disabilities on the basis of religious status . . . . [S]trict scrutiny applies . . . because Montana's no-aid provision discriminates based on religious status"); *Shapiro v. Thompson,* 394 U.S. 618, 631 (1969) (holding discriminating against individual for exercising fundamental constitutional rights is subject to heightened scrutiny), *overruled on other grounds by Edelman v. Jordan,* 415 U.S. 651 (1974); *see also Church of Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 540 (1993) (relying on Equal Protection principles in holding intentional discrimination against exercise of religion is subject to strict scrutiny).

- **Equal Protection Clause of the Fourteenth Amendment:** Prohibits States from denying any person the equal protection of the laws, relevant in the context of discrimination claims involving state or local government actions.

## IV.    UNLAWFUL DISCRIMINATORY POLICIES AND PRACTICES

The following is a non-exhaustive list of unlawful practices that could result in revocation of grant funding. Federal funding recipients may also be liable for discrimination if they knowingly fund the unlawful practices of contractors, grantees, and other third parties.

### A.    Granting Preferential Treatment Based on Protected Characteristics

#### 1.    What Constitutes Unlawful Preferential Treatment?

Preferential treatment occurs when a federally funded entity provides opportunities, benefits, or advantages to individuals or groups based on protected characteristics in a way that disadvantages other qualified persons, including such practices portrayed as "preferential" to certain groups. Such practices violate federal law unless they meet very narrow exceptions.

#### 2.    Examples of Unlawful Practices

**Race-Based Scholarships or Programs:** A university's DEI program establishes a scholarship fund exclusively for students of a specific racial group (e.g., "Black Student Excellence Scholarship") and excludes otherwise qualified applicants of other races, even if they meet academic or financial need criteria. This extends to any race-exclusive opportunities, such as internships, mentorship programs, or leadership initiatives that reserve spots for specific racial groups, regardless of intent to promote diversity. Such race-exclusive programs violate federal civil rights law by discriminating against individuals based solely on their race or treating people differently based on a protected characteristic without meeting the strict legal standards required for race-conscious programs.

**Preferential Hiring or Promotion Practices:** A federally funded entity's DEI policy prioritizes candidates from "underrepresented groups" for admission, hiring, or promotion, bypassing qualified candidates who do not belong to those groups, where the preferred "underrepresented groups" are determined on the basis of a protected characteristic like race.

**Access to Facilities or Resources Based on Race or Ethnicity:** A university's DEI initiative designates a "safe space" or lounge exclusively for students of a specific racial or ethnic group.

### B.      Prohibited Use of Proxies for Protected Characteristics

#### 1.      What Constitutes Unlawful Proxies?

Unlawful proxies occur when a federally funded entity intentionally uses ostensibly neutral criteria that function as substitutes for explicit consideration of race, sex, or other protected characteristics. While these criteria may appear facially neutral, they become legally problematic under any of the following circumstances:

- They are selected because they correlate with, replicate, or are used as substitutes for protected characteristics.

- They are implemented with the intent to advantage or disadvantage individuals based on protected characteristics.

#### 2.      Examples of Potentially Unlawful Proxies

**"Cultural Competence" Requirements:** A federally funded university requires job applicants to demonstrate "cultural competence," "lived experience," or "cross-cultural skills" in ways that effectively evaluate candidates' racial or ethnic backgrounds rather than objective qualifications. This includes selection criteria that advantage candidates who have experiences the employer associates with certain racial groups. For instance, requiring faculty candidates to describe how their "cultural background informs their teaching" may function as a proxy if used to evaluate candidates based on race or ethnicity.

**Geographic or Institutional Targeting:** A federally funded organization implements recruitment strategies targeting specific geographic areas, institutions, or organizations chosen primarily because of their racial or ethnic composition rather than other legitimate factors.

**"Overcoming Obstacles" Narratives or "Diversity Statements":** A federally funded program requires applicants to describe "obstacles they have overcome" or submit a "diversity statement" in a manner that advantages those who discuss experiences intrinsically tied to protected characteristics, using the narrative as a proxy for advantaging that protected characteristic in providing benefits.

### C.      Segregation Based on Protected Characteristics

#### 1.      What Constitutes Unlawful Segregation?

Segregation based on protected characteristics occurs when a federally funded entity organizes programs, activities, or resources—such as training sessions—in a way that separates or restricts access based on race, sex, or other protected characteristics. Such practices generally violate federal law by creating unequal treatment or reinforcing stereotypes, regardless of the stated goal (e.g., promoting inclusion or addressing historical inequities). Exceptions are narrow

and include only cases where federal law expressly permits race-based remedies for specific, documented acts of past discrimination by the institution itself, or in specialized contexts such as correctional facilities where courts have recognized compelling institutional interests.

While compelled segregation is generally impermissible, failing to maintain sex-separated athletic competitions and intimate spaces can also violate federal law. Federally funded institutions that allow males, including those self-identifying as "women," to access single-sex spaces designed for females—such as bathrooms, showers, locker rooms, or dormitories—undermine the privacy, safety, and equal opportunity of women and girls. Likewise, permitting males to compete in women's athletic events almost invariably denies women equal opportunity by eroding competitive fairness. These policies risk creating a hostile environment under Title VII, particularly where they compromise women's privacy, safety, or professional standing, and can violate Title IX by denying women access to the full scope of sex-based protections in education. To ensure compliance with federal law and to safeguard the rights of women and girls, organizations should affirm sex-based boundaries rooted in biological differences.

### 2.    Examples of Unlawful Practices

**Race-Based Training Sessions:** A federally funded university hosts a DEI training program that requires participants to separate into race-based groups (e.g., "Black Faculty Caucus" or "White Ally Group") for discussions, prohibiting individuals of other races from participating in specific sessions. In contrast, a "Faculty Academic Support Network" open to all faculty interested in promoting student success avoids reliance on protected characteristics and complies with federal law.

**Segregation in Facilities or Resources:** A college receiving federal funds designates a "BIPOC-only study lounge," facially discouraging access by students of other races. Even if access is technically open to all, the identity-based focus creates a perception of segregation and may foster a hostile environment. This extends to any resource allocation—such as study spaces, computer labs, or event venues—that segregates access based on protected characteristics, even if intended to create "safe spaces." This does not apply to facilities that are single-sex based on biological sex to protect privacy or safety, such as restrooms, showers, locker rooms, or lodging.

**Implicit Segregation Through Program Eligibility:** A federally funded community organization hosts a DEI-focused workshop series that requires participants to identify with a specific racial or ethnic group (e.g., "for underrepresented minorities only") or mandates sex-specific eligibility, effectively excluding others who meet objective program criteria. Use of Protected Characteristics in Candidate Selection

### 3.    What Constitutes Unlawful Use of Protected Characteristics?

Unlawful use of protected characteristics occurs when a federally funded entity or program considers race, sex, or any other protected trait as a basis for selecting candidates for employment

Memorandum for All Federal Agencies
Subject: Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination

Page 7

(e.g., hiring, promotions), contracts (e.g., vendor agreements), or program participation (e.g., internships, admissions, scholarships, training). This includes policies that explicitly mandate representation of specific groups in candidate pools or implicitly prioritize protected characteristics through selection criteria, such as "diverse slate" requirements, diversity decision-making panels, or diversity-focused evaluations. It also includes requirements that contracting entities utilize a specific level of working hours from individuals of certain protected characteristics to complete the contract. Such practices violate federal law by creating unequal treatment or disadvantaging otherwise qualified candidates, regardless of any intent to advance diversity goals.

### 4.      Examples of Unlawful Practices

**Race-Based "Diverse Slate" Policies in Hiring:** A federally funded research institute adopts a policy requiring that all interview slates for faculty positions include a minimum number of candidates from specific racial groups (e.g., at least two "underrepresented minority" candidates), rejecting otherwise qualified candidates who do not meet this racial criterion. This extends to any policy that sets racial benchmarks or mandates demographic representation in candidate pools, such as requiring a certain percentage of finalists to be from "diverse" backgrounds.

**Sex-Based Selection for Contracts:** A federally funded state agency implements a DEI policy that prioritizes awarding contracts to women-owned businesses, automatically advancing female vendors or minority-owned businesses over equally or more qualified businesses without preferred group status. This includes any contract selection process that uses sex or race as a tiebreaker or primary criterion, such as policies favoring "minority- or women-owned" businesses without satisfying the appropriate level of judicial scrutiny.

**Race- or Sex-Based Program Participation:** A federally funded university's internship program requires that 50% of selected participants be from "underrepresented racial groups" or female students, rejecting equally or more qualified applicants who do not meet these demographic criteria. This extends to any program—such as scholarships, fellowships, or leadership initiatives—that uses race, sex, or any other protected characteristic as a selection criterion, even if framed as addressing underrepresentation.

### D.      Training Programs That Promote Discrimination or Hostile Environments

### 1.      What Constitutes Unlawful DEI Training Programs?

Unlawful DEI training programs are those that—through their content, structure, or implementation—stereotype, exclude, or disadvantage individuals based on protected characteristics or create a hostile environment. This includes training that:

- Excludes or penalizes individuals based on protected characteristics.

- Creates an objectively hostile environment through severe or pervasive use of presentations, videos, and other workplace training materials that single out, demean, or stereotype individuals based on protected characteristics.

### 2.    Examples of Unlawful Practices

**Trainings That Promote Discrimination Based on Protected Characteristics:** A federally funded school district requires teachers to complete a DEI training that includes statements stereotyping individuals based on protected characteristics—such as "all white people are inherently privileged," "toxic masculinity," etc. Such trainings may violate Title VI or Title VII if they create a hostile environment or impose penalties for dissent in ways that result in discriminatory treatment.[6]

### E.    Recommendations on Best Practices

**Ensure Inclusive Access:** All workplace programs, activities, and resources should be open to all qualified individuals, regardless of race, sex, or other protected characteristics. Avoid organizing groups or sessions that exclude participants based on protected traits. Some sex separation is necessary where biological differences implicate privacy, safety, or athletic opportunity.

**Focus on Skills and Qualifications:** Base selection decisions on specific, measurable skills and qualifications directly related to job performance or program participation. For example, rather than asking about "cultural competence," assess specific skills such as language proficiency or relevant educational credentials. Criteria like socioeconomic status, first-generation status, or geographic diversity must not be used if selected to prioritize individuals based on racial, sex-based, or other protected characteristics.

**Prohibit Demographic-Driven Criteria:** Discontinue any program or policy designed to achieve discriminatory outcomes, even those using facially neutral means. Intent to influence demographic representation risks violating federal law. For example, a scholarship program must not target "underserved geographic areas" or "first-generation students" if the criteria are chosen to increase participation by specific racial or sex-based groups. Instead, use universally applicable criteria, such as academic merit or financial hardship, applied without regard to protected characteristics or demographic goals.

**Document Legitimate Rationales:** If using criteria in hiring, promotions, or selecting contracts that might correlate with protected characteristics, document clear, legitimate rationales unrelated to race, sex, or other protected characteristics. Ensure these rationales are consistently applied and are demonstrably related to legitimate, nondiscriminatory institutional objectives.

**Scrutinize Neutral Criteria for Proxy Effects:** Before implementing facially neutral criteria, rigorously evaluate and document whether they are proxies for race, sex, or other protected

---

[6] Federal law allows for workplace harassment trainings that are focused on preventing unlawful workplace discrimination and that do not single out particular groups as inherently racist or sexist.

characteristics. For instance, a program targeting "low-income students" must be applied uniformly without targeting areas or populations to achieve racial or sex-based outcomes.

**Eliminate Diversity Quotas:** Focus solely on nondiscriminatory performance metrics, such as program participation rates or academic outcomes, without reference to race, sex, or other protected traits. And discontinue policies that mandate representation of specific racial, sex-based, or other protected groups in candidate pools, hiring panels, or final selections. For example, replace a policy requiring "at least one minority candidate per slate" with a process that evaluates all applicants based on merit.

**Avoid Exclusionary Training Programs:** Ensure trainings are open to all qualified participants, regardless of protected characteristics. Avoid segregating participants into groups based on race, sex, or other protected characteristics. Trainings should not require participants to affirm specific ideological positions or "confess" to personal biases or privileges based on a protected characteristic.

**Include Nondiscrimination Clauses in Contracts to Third Parties and Monitor Compliance:** Incorporate explicit nondiscrimination clauses in grant agreements, contracts, or partnership agreements, requiring third parties to comply with federal law, and specify that federal funds cannot be used for programs that discriminate based on protected characteristics. Monitor third parties that receive federal funds to ensure ongoing compliance, including reviewing program materials, participant feedback, and outcomes to identify potential discriminatory practices. Terminate funding for noncompliant programs.

**Establish Clear Anti-Retaliation Procedures and Create Safe Reporting Mechanisms:** Implement and communicate policies that prohibit retaliation against individuals who engage in protected activities, such as raising concerns, filing complaints, or refusing to participate in potentially discriminatory programs. Include these policies in employee handbooks, student codes of conduct, and program guidelines. Provide confidential, accessible channels for individuals to report concerns about unlawful practices.

## V.    CONCLUSION

Entities are urged to review all programs, policies, and partnerships to ensure compliance with federal law, and discontinue any practices that discriminate on the basis of a protected status. The recommended best practices provided in this guidance are non-binding suggestions to assist entities in avoiding legal pitfalls and upholding equal opportunity for all. By prioritizing nondiscrimination, entities can mitigate the legal, financial, and reputational risks associated with unlawful DEI practices and fulfill their civil rights obligations.

# Exhibit B

**U.S. Department of Justice**

Office of the Deputy Attorney General

---

The Deputy Attorney General                    *Washington, D.C. 20530*

May 19, 2025

MEMORANDUM FOR        OFFICE OF THE ASSOCIATE ATTORNEY GENERAL
                      CIVIL DIVISION
                      CIVIL RIGHTS DIVISION
                      CRIMINAL DIVISION
                      EXECUTIVE OFFICE FOR UNITED STATES ATTORNEYS
                      ALL UNITED STATES ATTORNEYS

FROM:                 THE DEPUTY ATTORNEY GENERAL

SUBJECT:              Civil Rights Fraud Initiative

Under Attorney General Bondi's leadership, "[t]he Department of Justice is committed to enforcing federal civil rights laws and ensuring equal protection under the law." Attorney General Memorandum, *Ending Illegal DEI and DEIA Discrimination and Preferences* (Feb. 5, 2025). One of the most effective ways to accomplish this objective is through vigorous enforcement of the False Claims Act, 31 U.S.C. § 3729 et seq., against those who defraud the United States by taking its money while knowingly violating civil rights laws.

The False Claims Act is the Justice Department's primary weapon against government fraud, waste, and abuse. Liability results in treble damages and significant penalties. It is implicated when a federal contractor or recipient of federal funds knowingly violates civil rights laws—including but not limited to Title IV, Title VI, and Title IX, of the Civil Rights Act of 1964— and falsely certifies compliance with such laws. Accordingly, a university that accepts federal funds could violate the False Claims Act when it encourages antisemitism, refuses to protect Jewish students, allows men to intrude into women's bathrooms, or requires women to compete against men in athletic competitions. Colleges and universities cannot accept federal funds while discriminating against their students.

The False Claims Act is also implicated whenever federal-funding recipients or contractors certify compliance with civil rights laws while knowingly engaging in racist preferences, mandates, policies, programs, and activities, including through diversity, equity, and inclusion (DEI) programs that assign benefits or burdens on race, ethnicity, or national origin. While racial discrimination has always been illegal, the prohibition on such policies became clear after the Supreme Court stated that "[e]liminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 205 (2023).

President Trump reinforced that principle in Executive Order 14173, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*, 90 Fed. Reg. 8633 (Jan. 21, 2025), explaining that racist policies "violate the text and spirit of our long-standing Federal civil-rights laws."  Nevertheless, many corporations and schools continue to adhere to racist policies and preferences—albeit camouflaged with cosmetic changes that disguise their discriminatory nature.

The federal government should not subsidize unlawful discrimination.  To that end, I am standing up the Civil Rights Fraud Initiative.  This Initiative will utilize the False Claims Act to investigate and, as appropriate, pursue claims against any recipient of federal funds that knowingly violates federal civil rights laws.  This Initiative will be co-led by the Civil Division's Fraud Section, which enforces the False Claims Act, and the Civil Rights Division, which enforces civil rights laws.  Each division will identify a team of attorneys to aggressively pursue this work together.  Each of the 93 United States Attorney's Offices will identify an Assistant United States Attorney to advance these efforts.

To ensure a comprehensive approach, the Civil Fraud Section and the Civil Rights Division will engage in regular coordination meetings and share relevant information about potential violations.  The Civil Fraud Section and the Civil Rights Division will also engage with the Criminal Division, as well as with other federal agencies that enforce civil rights requirements for federal funding recipients, including the Department of Education, the Department of Health and Human Services, the Department of Housing and Urban Development, and the Department of Labor.  The Civil Fraud Section and the Civil Rights Division will also establish partnerships with state attorneys general and local law enforcement to share information and coordinate enforcement actions.

The Department recognizes that it alone cannot identify every instance of civil rights fraud.  Congress likewise has recognized as much and, as a result, has authorized private parties to protect the public interest by filing lawsuits and litigating claims under the False Claims Act—and, if successful, sharing in any monetary recovery.  *See* 31 U.S.C. § 3730.  The Department strongly encourages these lawsuits.  The Department also encourages anyone with knowledge of discrimination by federal-funding recipients to report that information to the appropriate federal authorities so that the Department may consider the information and take any appropriate action.  Please visit https://www.justice.gov/civil/report-fraud for more information.